## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHRISTOPHER GRAHAM; OWEN STEVENS; FIREARMS POLICY COALITION, INC., and SECOND AMENDMENT FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>KATHY JENNINGS, Attorney General of the State of Delaware,<br><br>Defendant. | C.A. No. |

Plaintiffs Christopher Graham ("Graham"), Owen Stevens ("Stevens"), Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF"), by and through their undersigned counsel, bring this action against Defendant Kathy Jennings in her official capacity as Attorney General of the State of Delaware ("Defendant") and allege as follows:

### INTRODUCTION

1.      On June 30, 2022, Delaware Governor John Carney signed into law Senate Substitute No. 1 for Senate Bill No. 6, as amended ("SB 6"), thereby criminalizing one of the most common and important means by which Delaware citizens can exercise their fundamental right of self-defense. SB 6 makes it a crime to purchase, receive, possess, transfer, sell, offer to sell, or manufacture standard-capacity firearm magazines that can hold more than 17 rounds of ammunition ("standard capacity magazines"). Through SB 6, the State of Delaware (the "State") has barred law-abiding citizens from legally acquiring common ammunition magazines and deprived them of an effective means of self-defense (the "Ban").

2.     Absent relief from this Court, Defendant will continue to violate the constitutionally protected rights of Delaware's law-abiding citizens and reinforce the erroneous notion that the right to keep and bear arms is nothing more than "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

3.     During uncertain times—with the recognition that governments have no legal duty to protect the people they serve—there is no guarantee that law enforcement will respond to an individual's 9-1-1 call during a crisis or after it (let alone in time to prevent a crime), and those who choose to exercise their fundamental and individual Second and Fourteenth Amendment protected rights cannot be denied those rights. Uncertain times are precisely when fundamental rights—like the right to keep and bear arms for self-defense—must be protected.

4.     While earlier decisions in the Third Circuit employed a two-step approach under intermediate scrutiny to resolve Second Amendment questions, the U.S. Supreme Court expressly and unequivocally rejected that approach in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (U.S. June 23, 2022). In *Bruen*, the Court rejected that two-step approach as "one step too many" and held that the appropriate "standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 2022 WL 2251305, at *9, 11.

5.     In *Bruen*, the Supreme Court further held: "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the

outer bounds of the right to keep and bear arms." 142 S. Ct., at 2127. Rather, "*Heller* … demands a test rooted in the Second Amendment's text, as informed by history." *Id.*

6.      It is patently clear that *Bruen* did not create a new test but instead applied the very test the Court established in *District of Columbia v. Heller*, 554 U.S. 570, in 2008. "The test that [the Court] set forth in *Heller* and appl[ies] today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. "*Heller*'s methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id.*, at 2128-29.

7.      The plain text of the Second Amendment covers the conduct the Plaintiffs wish to engage in ("keep and bear arms") and the arms or components thereof (standard capacity magazines) they wish to keep and bear because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 142 S. Ct., at 2132. And "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." 142 S. Ct., at 2126.

8.      *Heller* has already established the relevant contours of the tradition: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are *both* dangerous *and* unusual. But arms that are in common use—such as those that typically feature the standard capacity magazines banned by Delaware—cannot be both dangerous and unusual. And,

to be sure, the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *Bruen*, 142 S. Ct., at 2132 (quoting *Heller*, 554 U. S., at 582).

## JURISDICTION AND VENUE

9.   This Court has subject-matter jurisdiction over Plaintiffs' claim under 28 U.S.C. §§ 1331 and 1343.

10.   Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988.

11.   Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) & (b)(2).

## PARTIES

12.   Plaintiff Christopher Graham is a natural person and a citizen of New Castle County, Delaware. He owns at least one firearm that may be equipped with standard capacity magazines as well as multiple standard capacity magazines. He intends to continue purchasing standard capacity magazines for his existing firearms as well as purchase additional firearms equipped with standard capacity magazines. However, because Delaware's standard capacity magazine ban has eliminated the legal market for magazines, he is unable to fulfill his desire to purchase such magazines in Delaware and fears prosecution for purchasing them out of state and importing them himself.

13.   Plaintiff Owen Stevens is a natural person and a citizen of New Castle County, Delaware. He owns at least one firearm that may be equipped with standard capacity magazines as well as multiple standard capacity magazines. He intends to continue purchasing standard capacity magazines for his existing firearms as well as purchase additional firearms equipped with standard capacity magazines. However, because Delaware's standard capacity magazine ban has eliminated the legal market for magazines, he is unable to fulfill his desire to purchase such

magazines in Delaware and fears prosecution for purchasing them out of state and importing them himself.

14.     Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a 501(c)(4) non-profit organization incorporated under the laws of Delaware with its principal place of business in Sacramento, California. The purposes of FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC's members reside both within and outside Delaware. FPC brings this action on behalf of those members, including the named Plaintiffs herein. FPC's Delaware members are adversely and directly harmed by Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein.

15.     Plaintiff Second Amendment Foundation ("SAF") is a nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control. SAF has over 720,000 members and supporters nationwide, including thousands of members in Delaware. SAF brings this action on behalf of those members, including the named Plaintiffs herein. SAF's members are adversely and directly harmed by Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein.

16.     Defendant Jennings is the Attorney General of the State of Delaware, "the State's chief law enforcement officer."[1] As Attorney General, Defendant Jennings supervises, directs, and controls the Department of Justice of the State of Delaware. *See* 29 Del. C. § 2502. Thus, Defendant Jennings is wholly or partially responsible for overseeing, implementing, and enforcing the Ban, regulatory programs, and related policies, practices, and customs designed to propagate the same. Among the powers conferred by the Delaware General Assembly upon the Attorney General is the authority "to have charge of all criminal proceedings." 29 Del. C. § 2504(6). Defendant Jennings is sued in her official capacity as Attorney General of the State of Delaware.

## STATEMENT OF FACTS

17.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms *shall not* be infringed." U.S. CONST. amend. II (emphasis added).

18.     Incorporated against the states through the Fourteenth Amendment (*McDonald*, 561 U.S. at 750), the Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595. It is "a fundamental constitutional right guaranteed to the people," *id*., which is and always has been key to "our scheme of ordered liberty." *McDonald*, 561 U.S. at 767-68.

### *Delaware's Unconstitutional Ban on So-Called "Large-Capacity Magazines"*

19.     On June 30, 2022, Delaware Governor John Carney signed into law SB 6, which made it illegal for law-abiding citizens of Delaware to "manufacture, sell, offer for sale, purchase receive, transfer or possess" a "large-capacity magazine," 11 Del. C. § 1466(a), defined as "any

---

[1] *See* https://attorneygeneral.delaware.gov/about/.

ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition."

20.    The Ban exempts (1)"[a] large-capacity magazine that a person has rendered permanently inoperable or has permanently modified to accept 17 rounds of ammunition or less," 11 Del. C. § 1466(c)(7), and (2) an attached tubular device designed to accept, and only capable of operating with, .22 caliber rimfire ammunition," 11 Del. C. § 1465(2)(b).

21.    The Ban also exempts: (1) "Personnel of the United States government or a unit of that government who are acting within the scope of official business"; (2) Members of the armed forces of the United States or of the National Guard who are acting within the scope of official business"; (3) "A law-enforcement officer"; (4) "A qualified retired law-enforcement officer"; (5) "An individual who holds a valid concealed carry permit issued by the Superior Court under § 1441 of this title"; and (6) "A licensed firearms dealer that sells a large-capacity magazine to another licensed firearms dealer or to an individual exempt under paragraphs (c)(1) through (5) of this section."

22.    The penalty for a first offense of the Ban involving only possession of a "large-capacity magazine" is a civil penalty of One Hundred Dollars ($100.00). 11 Del. C. § 1466(b)(1). A second violation of the Ban that involves only possession of a "large-capacity magazine" is a class B misdemeanor. A class B misdemeanor is punishable by up to 6 months of incarceration and fines up to $1,150. 11 Del. C. § 4206(b). All other violations of the Ban, including first offenses that do not solely involve possession, are class E felonies. 11 Del. C. § 1466(b)(3). A class E felony is punishable by up to 5 years of incarceration. 11 Del. C. § 4205(b)(5).

*Delaware Has Criminalized a Common and Important Means of Self-Defense*

23.     Although the Ban describes magazines that can accept more than 17 rounds of ammunition as "large-capacity magazines," this is a misnomer. Magazines capable of holding more than 17 rounds of ammunition are a normal feature of many firearms in the United States and are more accurately described as "standard capacity magazines."

24.     For example, magazines holding 30 rounds are the standard for the AR-15 and similar rifles. AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans. A recent survey of gun owners indicates that about 24.6 million Americans have owned up to 44 million AR-15 or similar rifles. *See* William English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw. And according to industry sources, even ten years ago more than one out of every five firearms sold in recent years was an AR-15 or similar rifle. Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (2013) at 11. *See also* Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/; Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf; Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (March 2021), https://www3.nssf.org/share/PDF/pubs/Firearms-Retailer-Survey-Report-2021.pdf; Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020*, https://www3.nssf.org/share/PDF/pubs/Sport-Shooting-Participation-2020.pdf.

25.     Notwithstanding their enormous popularity, AR-15s and similar rifles commonly equipped with magazines holding more than 17 rounds are very rarely used in the commission of

crimes. According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes." This has long been true. *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'"). Indeed, according to FBI statistics, in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects. *See* Expanded Homicide Table 8, Crime in the United States (FBI 2019), https://bit.ly/3HdolNd.

26.     The magazines now banned by the State are common throughout the country. Indeed, 40 states do not impose any restrictions on magazine capacity.

27.     The ubiquity of standard capacity magazines among law-abiding Americans demonstrates that they are useful for lawful purposes such as self-defense and hunting. In fact, Professor English found that recreational target shooting (64.3%), home defense (62.4%), hunting (47%), and defense outside the home (41.7%) are the most common reasons cited by individuals who own standard capacity magazines that hold more than 10 rounds. English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned*,  at 23.

28.     Proponents of bans like Delaware's Ban often seek to justify them based on a concern with mass shooting events specifically. But mass shootings represent an extremely small subset of all violent crime committed with a gun, and mass shootings involving firearms that feature magazines holding more than 17 rounds are an even smaller subset still. *See* Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, RAND (April 15, 2021), https://bit.ly/3MRkTtu ("Mass shootings are tragic, traumatic, and shocking events. . . . However, they represent a very small fraction of the homicides in the United States.").

29.     In fact, from 1976 through 2018, an average of just 26 people were killed per year in public mass shooting incidents (defined as "incidents that occur in the absence of other criminal activity (e.g., robberies, drug deals, and gang 'turf wars') in which a gun was used to kill four or more victims in a public location within a 24-hour period"). Grant Duwe, *Patterns and prevalence of lethal mass violence*, 2019 J. CRIM. & PUB. POL'Y 1, 12 (2019). That is slightly lower than the number of individuals (27) killed each year by lightning strikes and significantly lower than the number injured by lightning strikes (243). *How Dangerous is Lightning?*, NAT'L WEATHER SERV., https://bit.ly/3wN3iNU. Furthermore, there is no convincing empirical evidence that a state magazine ban will have any impact at all on mass shootings. *See* Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, 81 n.95, NAT'L INST. OF JUST., U.S. DEP'T OF JUST., https://bit.ly/3NDzBUK (explaining that "it is hard to draw definitive conclusions" about the effectiveness of state assault weapons bans in part because "the impact of [such] laws is likely undermined to some degree by the influx of [assault weapons] from other states").

30.     Further, given the fact that the *Bruen* Court expressly rejected means-end interest-balancing inquiries in Second Amendment cases, the justifications or purported objectives of the General Assembly in connection with passing SB 6 are immaterial and entitled to no deference from this Court.

### The Ban is Not Supported by any Historical Tradition of Firearm Regulation in the U.S.

31.     In line with the widespread possession and use of standard capacity magazines and the rarity of their use for crime, there is no historical tradition of prohibiting the possession, purchase, transfer, manufacture, or sale of such magazines. Magazine bans were unknown in the United States before the 20th century. Bans like Delaware's are recent phenomena—indeed, until

the Ban was put in place, Delaware did not restrict possessing, purchasing, manufacturing, transferring, or selling standard capacity magazines, and no such laws existed *anywhere* in the United States before the 1990s.

32.     This is true even though firearms capable of holding multiple rounds have existed since the late 15th century, and firearms capable of firing approximately 17 or more rounds without reloading have existed at least since the late 16th century. *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 852–53 (2015) ("The first known firearm that was able to fire more than ten rounds without reloading was a sixteen-shooter created around 1580, using 'superposed' loads (each round stacked on top of the other.)").

33.     Multiple round firearm technology quickly developed from multi-shot wheel lock rifles to repeating, magazine-fed rifles, with the English military employing magazine-fed repeating firearms as early as 1658. Clayton E. Cramer & Joseph E. Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008) (citing A. V. B. NORMAN & DON POTTINGER, ENGLISH WEAPONS & WARFARE: 449–1660, 206–07 (1979)). The now famous "Puckle Gun," or "Defence Gun," was patented by James Puckle in 1718 in England and operated using "a Sett of Chambers ready Charg'd to be Slip'd on when the first Sett are pull'd off to be recharg'd." U.K. Patent No. 418 (filed May 15, 1718) https://bit.ly/3t5UGzu; CHARLES FOULKES, THE GUN-FOUNDERS OF ENGLAND: WITH A LIST OF ENGLISH AND CONTINENTAL GUN-FOUNDERS FROM THE XIV TO THE XIX CENTURIES 32–33 (1937).

34.     Firearms capable of firing multiple rounds without reloading were well known to the founding generation. In 1777, Joseph Belton demonstrated a repeating rifle that could hold 16 rounds of ammunition to members of the Continental Congress. Robert Held, THE BELTON SYSTEMS, 1758 & 1784–86: AMERICA'S FIRST REPEATING FIREARMS 37 (1986). Belton also

informed Congress that he could equip his rifle with as many as 20 rounds at a time. *Id.* at 17. And Meriwether Lewis carried a Girandoni air rifle, with a 22-round tubular, spring-loaded magazine on his expedition with William Clark. James B. Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

35.     "Repeater" firearms were extremely popular in the 19th century and came in many forms. The New York Evening Post in 1821 lauded Isaiah Jennings for inventing a repeater "important[t] for both public and private use," whose "number of charges may be extended to fifteen or even twenty." *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, in 59 Alexander Tilloch, THE PHILOSOPHICAL MAGAZINE AND JOURNAL COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE 467-68 (Richard Taylor ed., 1822).

36.     Around the time of the Civil War, multi-round rifles became commonplace. The 16-shot Henry Rifle, invented in 1861, was very popular. Soon after, the first Winchester rifle was produced, and it could hold 17 rounds in the magazine with one more in the chamber. *See* Norm Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE FIREARMS AND THEIR VALUES 268 (6th ed. 1994). As a result, standard capacity magazines were commonly possessed already in the 1860s, 130 years before attempts to strictly regulate them would come along. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 871 (2015).

37.     Moreover, and while demonstrating it is not a burden assumed by the Plaintiffs here nor the basis for a defense available to Defendant, there is no reliable proof that restrictions on new manufacturing or sales of standard capacity magazines will reduce violence involving firearms. Between 1994 and 2004, federal law prohibited possession or transfer of magazines holding more than 10 rounds of ammunition (though it exempted magazines lawfully possessed

before the law's enactment). A report prepared for the U.S. Department of Justice assessing the effectiveness of the law concluded: "[W]e cannot clearly credit the ban with any of the nation's recent drop in gun violence," and "there has been no discernible reduction in the lethality and injuriousness of gun violence." Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. DEP'T OF JUSTICE at 96 (2004), *available at* https://bit.ly/3MQZmkL. What is more, due to the porousness of state borders there is even less reason to think that a state-level ban would be effective in reducing violence. *See id.* at 81 n.95.

38.     There are many sound reasons why the average citizen might want to use magazines that accept more than 17 rounds of ammunition. Most obviously, a law-abiding citizen would not want to run out of ammunition and be forced to reload while under criminal attack, which could involve multiple assailants, an assailant using a magazine containing more than 17 rounds, or an assailant using multiple firearms. In fact, according to the 2021 National Firearms Survey, in over half of self-defense incidents the defender faced two or more attackers—and in over 20% there were three or more. English, *supra* ¶ 29, at 15. Given the stressful and often-unexpected nature of such encounters, forcing the victim to reload puts her at a significant disadvantage relative to her assailant.

39.     Standard capacity magazines are also important for average citizens seeking to defend themselves because most shots fired in armed altercations miss their target. Professional police, who are trained and must regularly practice with their firearms, miss their targets more often than not. In a fourteen-year study of the Dallas Police Department, for example, officers achieved an accuracy rate of just 35%, and half of all Dallas officers missed *every* shot they fired. Christopher M. Donner and Nicole Popovich, Hitting (or missing) the mark: An examination of

police shooting accuracy in officer-involved shooting incidents, *Policing: An International Journal* 42, no. 3 (2019), https://bit.ly/3LrpoJC. An average citizen forced to defend herself suddenly is not likely to have a higher accuracy rate than professional police officers would.

40.     As an example, Susan Gonzalez, a Jacksonville resident, was severely limited in her ability to defend herself by the size of her handgun's magazine. She was shot in the chest one evening when two armed men broke into her home. She retreated to her bedroom and found her husband's .22 pistol. After firing warning shots, she shot at one of the two men and hit him twice with her seven or eight remaining bullets. Out of ammunition and unable to reload, she was shot once more by the other gunman, who proceeded to put his gun to her head and demand the keys to the couple's truck. *See Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1130–31 (S.D. Cal. 2017).

41.     Unlike law-abiding citizens, violent criminals will not be meaningfully constrained by Delaware's Ban. Given the tens or hundreds of millions of standard capacity magazines in circulation in the country (including in Delaware, where they remain widely possessed), it will not be difficult for violent criminals to acquire them through illegal sales or importation despite Delaware's Ban. And unlike law-abiding citizens, violent criminals will have no compunction about violating Delaware's Ban. Even if violent criminals were effectively prevented from acquiring banned magazines, they could easily compensate by bringing multiple firearms or magazines with them to the scene of the crime. Their ability to do so is made possible by the fact that violent criminals, and not their law-abiding victims, choose the time and place of crimes and can plan accordingly.

42.     That the Plaintiffs have not specifically been threatened with enforcement of the Ban (beyond the threat to the general population embodied in its passage) is immaterial. Plaintiffs, by virtue of being law-abiding purchasers of standard capacity magazines, risk being subject to

14

civil penalties and prosecution as soon as they attempt to violate the Ban. *See Hecox v. Little*, 479 F. Supp. 3d 930, 367 (D. Idaho 2020) ("That a specific individual has not threatened [a sex dispute] challenge is immaterial because the Act has never been in effect during a school sport's season and the sex dispute challenge has thus never been available, and, by virtue of being a female student athlete, Jane risks being subject to a sex dispute challenge as soon as she tries out for Boise High's girls' soccer team."); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).

### *Delaware's Ban Violates the Second and Fourteenth Amendments*

43.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

44.     The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

45.     The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id*. at 805 (Thomas, J., concurring).

46.      "The very enumeration of the right [to keep and bear arms] takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. 570, 634 (2008) (emphasis in original).

47.      "Constitutional rights are enshrined with the scope they were understood to have

when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634–35.

48.     For this reason, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582 (citations omitted).

49.     Because Delaware bans components of arms in common use today, the Ban violates the Second and Fourteenth Amendments.

50.     In order to justify a law that affects Plaintiffs' Second Amendment rights, the government bears the affirmative burden of proving that the regulation is consistent with our nation's history and tradition. *Bruen*, 2022 WL 2251305, at *9. As a matter of law, any statute or regulation that bans ownership of firearms in common use for lawful purposes like self-defense is inconsistent with this nation's history and tradition, and thus violates the Second Amendment. *Id*. at 12; *Heller*, 554 U.S. at 624.

51.     The magazines at issue in this case are standard components of the sorts of bearable arms in common use for lawful purposes that law-abiding Americans possess at home by the tens of millions. And they are, moreover, exactly what they would bring to service in militia duty should that be necessary.

52.     The People have a constitutional right to make and make use of common firearms and their standard components for effective self-defense and not to be disarmed or arbitrarily limited by the enactment and enforcement of bans like the one at issue here.

53.     Assuming ordinary citizens are not disqualified from exercising Second Amendment rights, the State *must* permit them to keep and bear the standard components of

common firearms, now banned by Delaware, for lawful purposes.

54.     The Second Amendment is an "unqualified command." *Bruen*, 2022 WL 2251305, at *11. When a law — like Delaware's Ban at issue here — prevents citizens from owning firearms that are in common use for lawful purposes, then the law violates the Second Amendment. *Id*. It cannot be justified by reference to any countervailing governmental interest. *Id*. Moreover, considerations of whether such a law puts a "serious," "substantial," or "onerous" (or any other qualifier) burden on the Second Amendment are immaterial.

55.     The right to keep and bear common firearms guaranteed under the Bill of Rights cannot be subjected to laws and regulations that prohibit ordinary, law-abiding citizens from keeping and bearing common firearms—particularly when such schemes place these citizens under constant threat of criminal sanction for violating them.

56.     The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Id*. at 636. Yet, this is precisely how Delaware's laws operate, arbitrarily limiting and disadvantaging law-abiding citizens in the exercise of their fundamental Second Amendment rights in Delaware.

### *Facts Relating to All Plaintiffs*

57.     Unless and until enjoined, Defendant's active administration, implementation, and enforcement of Delaware's Ban on the possession, acquisition, transport, sale, offering to sell, transfer, and manufacture of so-called "large-capacity magazines" has violated and will continue to violate the Plaintiffs' fundamental, individual right to keep and bear arms.

### *Facts Relating to Plaintiff Christopher Graham*

58.     The foregoing paragraphs are incorporated herein by reference as if set forth in full below.

59.    Graham is an adult resident of New Castle County, Delaware.

60.    Graham is a law-abiding, responsible citizen.

61.    Graham is a member of Plaintiffs FPC and SAF.

62.    Graham owns firearms that may be equipped with standard capacity magazines capable of holding more than 17 rounds of ammunition, and Graham owns standard capacity magazines capable of holding more than 17 rounds of ammunition for those firearms.

63.    Graham desires to purchase additional firearms that are ordinarily sold with standard capacity magazines capable of holding more than 17 rounds of ammunition.

64.    Graham intends to use additional standard capacity magazines and firearms equipped with them for self-defense and other lawful purposes.

65.    It is Graham's present intention and desire to purchase additional standard capacity magazines capable of holding more than 17 rounds of ammunition for use with the firearms he currently owns and to purchase additional firearms equipped with standing capacity magazines of that size. However, he is unable to purchase additional magazines or firearms equipped with standard capacity magazines lawfully because the existence of the Ban, and Defendant's enforcement of it, has extinguished the legal market for those items in Delaware and made it unlawful for Graham to import them himself. But for the Ban and Defendant's enforcement of it, Graham would acquire additional standard capacity magazines capable of holding more than 17 rounds of ammunition.

### *Facts Relating to Plaintiff Owen Stevens*

66.    The foregoing paragraphs are incorporated herein by reference as if set forth in full below.

67.    Stevens is an adult resident of New Castle County, Delaware.

68.   Stevens is a law-abiding, responsible citizen.

69.   Stevens is a member of Plaintiffs FPC and SAF.

70.   Stevens owns firearms that may be equipped with standard capacity magazines capable of holding more than 17 rounds of ammunition, and Stevens owns standard capacity magazines capable of holding more than 17 rounds of ammunition for those firearms.

71.   Stevens desires to purchase additional firearms that are ordinarily sold with standard capacity magazines capable of holding more than 17 rounds of ammunition.

72.   Stevens intends to use additional standard capacity magazines and firearms equipped with them for self-defense and other lawful purposes.

73.   It is Stevens' present intention and desire to purchase additional standard capacity magazines capable of holding more than 17 rounds of ammunition for use with the firearms he currently owns and to purchase additional firearms equipped with standing capacity magazines of that size. However, he is unable to purchase additional magazines or firearms equipped with standard capacity magazines lawfully because the existence of the Ban, and Defendant's enforcement of it, has extinguished the legal market for those items in Delaware and made it unlawful for Stevens to import them himself. But for the Ban and Defendant's enforcement of it, Stevens would acquire additional standard capacity magazines capable of holding more than 17 rounds of ammunition.

### *Facts Relating to Plaintiff Firearms Policy Coalition, Inc.*

74.   The foregoing paragraphs are incorporated herein by reference as if set forth in full below.

75.   Plaintiff FPC has members in Delaware, including plaintiffs herein, who wish to lawfully keep and bear arms outfitted with the standard capacity magazines now banned in

Delaware.

76.     Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

77.     FPC represents its members who include gun owners, prospective gun owners, self-manufacturers, retailers of firearm parts, tools, and supplies, and others who engage in the right to keep and bear arms, and brings this action on behalf of them, including plaintiffs herein.

78.     Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

79.     FPC's Delaware resident members, including plaintiffs herein, and those who reside outside of Delaware but who wish to keep and bear arms in Delaware, have been and will continue to be adversely and directly harmed by Defendant's administration, implementation, and enforcement of the laws, and related regulations, policies, practices, and customs challenged herein and will otherwise remain so adversely and directly affected under Delaware's Ban challenged herein.

80.     Like Plaintiffs Graham and Stevens, many of Plaintiff FPC's Delaware resident members desire and intend to acquire, possess, and lawfully use standard capacity magazines and the firearms that they are compatible with and which are otherwise in common use for self-defense and other lawful purposes.

81.     Based on the threat of penalties and prosecution by and through Delaware's Ban that Defendant is actively enforcing, FPC's Delaware resident members have been prevented from, *inter alia*, purchasing, receiving, possessing, transferring, selling, offering to sell, manufacturing, or lawfully using banned standard capacity magazines that Delaware has arbitrarily and tendentiously labeled "large-capacity magazines."

82.     FPC reasonably fears the prosecution of its Delaware resident members by and through Defendant's administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein.

**_Facts Relating to Plaintiff Second Amendment Foundation_**

83.     The foregoing paragraphs are incorporated herein by reference as if set forth in full below.

84.     The purposes of Plaintiff SAF include promoting a better understanding of the nation's Constitutional heritage to privately own and possess firearms. To that end, SAF carries on educational and legal action programs designed to better inform the public about the debate concerning gun control.

85.     Plaintiff SAF serves its members through grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. SAF further serves as a resource for authors of books, newspaper and magazine articles and television and radio programs dealing with various aspects of the right to keep and bear arms.

86.     SAF represents its members who include gun owners, prospective gun owners, self-manufacturers, retailers of firearm parts, tools, and supplies, and others who engage in the right to keep and bear arms, and brings this action on behalf of them, including plaintiffs herein.

87.     SAF's Delaware resident members, including plaintiffs herein, and those who reside outside of Delaware but who wish to keep and bear arms in Delaware, have been and will continue to be adversely and directly harmed by Defendant's administration, implementation, and enforcement of the laws, and related regulations, policies, practices, and customs challenged herein and will otherwise remain so adversely and directly affected under Delaware's Ban challenged herein.

88.     Like Plaintiffs Graham and Stevens, many of Plaintiff SAF's Delaware resident members desire and intend to acquire, possess, and lawfully use standard capacity magazines and the firearms that they are compatible with and which are otherwise in common use for self-defense and other lawful purposes.

89.     Based on the threat of penalties and prosecution by and through Delaware's Ban that Defendant is actively enforcing, SAF's Delaware resident members have been prevented from, *inter alia*, purchasing, receiving, possessing, transferring, selling, offering to sell, manufacturing, or lawfully using banned standard capacity magazines that Delaware has arbitrarily and tendentiously labeled "large-capacity magazines."

90.     SAF reasonably fears the prosecution of its Delaware resident members by and through Defendant's administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein.

## COUNT ONE

**Violation of the United States Constitution
Second and Fourteenth Amendments
(42 U.S.C. § 1983)
(All Plaintiffs v. Defendant)**

91.     The foregoing paragraphs are incorporated herein by reference as if set forth in full below.

92.     The Second Amendment to the Constitution of the United States forbids government actions infringing the right to keep and bear arms. It applies to Defendant by virtue of the Fourteenth Amendment to the Constitution of the United States.

93.     There is an actual and present controversy between the parties.

94.     The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of the states their fundamental right to keep and bear arms, both in the home and in public.

95.     The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

96.     The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, possess, purchase, receive, transport, and lawfully use common firearms for all lawful purposes, including self-defense, and naturally extends to the parts of those firearms, including magazines.

97.     Delaware arbitrarily labels standard capacity magazines capable of holding more than 17 rounds as "large-capacity magazines" and bans them despite the fact that they, along with the firearms with which they are compatible, are in common use for lawful purposes. There is no historical tradition of this sort of firearm regulation in the United States.

98.     42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

99.     Defendant, acting under color of state law at all relevant times, has deprived the fundamental constitutional rights of persons in Delaware, Plaintiffs Graham, Stevens, and all similarly situated members of Plaintiffs FPC and SAF, through enforcement of the State's laws banning the purchase, receipt, possession, transfer, sale, offer to sell, or manufacture of constitutionally protected firearm components.

100.     Delaware's Ban on, *inter alia*, the purchase, receipt, possession, transfer, sale, offer to sell, or manufacture of so-called "large-capacity magazines" inflicts irreparable harm on

Plaintiffs by prohibiting possession of property and conduct protected by the Second Amendment individual right to keep and bear arms.

101.    Plaintiffs lack an adequate remedy at law for this burden on their Second Amendment rights, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendant. The public interest favors enjoining unconstitutional statutes, including those underlying Delaware's Ban on, *inter alia,* purchasing, receiving, possessing, transferring, selling, offering to sell, manufacturing, or lawfully using banned standard capacity magazines that Delaware has arbitrarily and tendentiously labeled "large-capacity magazines."

102.    Therefore, as a direct and proximate result of the above infringement of and impermissible burden on the rights of Plaintiffs protected under the Second Amendment, Plaintiffs and all similarly situated Delaware resident and visitor members of FPC and SAF have suffered an unlawful deprivation of their fundamental constitutional right to keep and bear arms, and they will continue to suffer such injury unless and until granted the relief they seek herein.

103.    Thus, injunctive relief is appropriate to protect against the irreparable harm of the ongoing deprivation of their Second Amendment rights.

104.    Defendant, having acted under color of law, policy, custom or practice to subject Plaintiffs to the deprivation of their right to keep and bear arms, is liable under 42 U.S.C. § 1983 "in an action at law, suit in equity, or other proper proceeding for redress[.]" For all the reasons asserted herein, Defendant has acted in violation of, and continues to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment

in their favor and against Defendant, as follows:

a)      A declaratory judgment that Delaware's Ban on standard capacity magazines that it has labeled "large-capacity magazines" and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs Graham, Stevens, all similarly situated members of Plaintiffs FPC and SAF from exercising their fundamental right to keep and bear arms, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution, and are therefore unconstitutional;

b)      A preliminary and permanent injunction prohibiting Defendant, and Defendant's respective employees, officers, agents, representatives, and all those acting in concert or participation with them, from enforcing Delaware's Ban on the magazines at issue and all related regulations, policies, and/or customs designed to enforce or implement the same;

c)      Attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and,

d)      Any and all other and further legal and equitable relief against Defendant as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.


Dated: January 12, 2023                    **GELLERT SCALI BUSENKELL & BROWN LLC**

                                           */s/ Bradley P. Lehman*
                                           Bradley P. Lehman (No. 5921)
                                           1201 N. Orange Street, Suite 300
                                           Wilmington, DE 19801
                                           P: (302) 425-5800
                                           E: blehman@gsbblaw.com

                                           *Attorney for Plaintiffs*